15-3239-cv
Vasquez v. Empress Ambulance Serv., Inc.

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2015

(Argued: April 27, 2016          Decided: August 29, 2016)

Docket No. 15-3239-cv

―――――――――――――――――――

ANDREA VASQUEZ,

*Plaintiff-Appellant*,

– v. –

EMPRESS AMBULANCE SERVICE, INC.,

*Defendant-Appellee*,

TYRELL GRAY, individually,

*Defendant*.

―――――――――――――――――――

Before: WALKER, CALABRESI, and HALL, *Circuit Judges*.

Plaintiff Andrea Vasquez, an emergency medical technician working for Empress Ambulance Service, Inc. ("Empress"), was subjected to unwanted sexual overtures by another Empress employee while on the job. Vasquez promptly complained of her co-worker's conduct and was assured by supervisors that her complaint would be investigated. That investigation, however, consisted of Empress crediting false documents manufactured by Vasquez's co-worker that purported to show Vasquez's eager assent to a sexual relationship and refusing to consider further contradictory evidence. In reliance on these documents, Empress fired Vasquez. Vasquez subsequently filed suit in the Southern District of New York, alleging that Empress had retaliated against her in violation of Title VII and New York State Human Rights Law. The District Court (Buchwald, *J.*) dismissed the case, holding that the retaliatory intent of Vasquez's co-worker, a low-level employee, could not be imputed to Empress and that Empress consequently could not have engaged in retaliation. We conclude, however, that agency principles permit the retaliatory intent of Vasquez's co-worker to be imputed, as a result of Empress's alleged negligence, to Empress.

1

Accordingly, we vacate the judgment of the district court and remand for further proceedings.

CASEY WOLNOWSKI, Phillips & Associates, New York, NY, *for Plaintiff-Appellant*

DEBRA LYNNE WABNIK, Stagg, Terenzi, Confusione & Wabnik, LLP, Garden City, NY, *for Defendant-Appellee*

CALABRESI, *Circuit Judge*:

In the space of twenty-four hours, Andrea Vasquez faced unwelcome sexual advances in the workplace, complained about that conduct to her employer, and lost her job. After receiving unsolicited sexual photographs from a co-worker one night shift, Vasquez promptly informed her supervisor and filed a formal complaint of sexual harassment, which her employer promised to investigate that same morning. Within a few hours, however, Vasquez's co-worker had discovered her complaint and had provided the employer with false documents purporting to show Vasquez's consent to and solicitation of a sexual relationship. In reliance on those documents, and notwithstanding Vasquez's offers to produce evidence in refutation, Vasquez's employer immediately fired her on the ground that *she* had engaged in sexual harassment. Vasquez consequently brought suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), and New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq*. ("NYSHRL"), alleging that she was wrongfully terminated in retaliation for complaining of sexual harassment. The district court dismissed Vasquez's claims, holding that Vasquez's employer could not have engaged in retaliation because it could not be held responsible for the retaliatory animus of Vasquez's co-worker, a low-level employee with no decisionmaking authority. We hold, however, that an employee's retaliatory intent may be imputed to an employer where, as

2

alleged here, the employer's own negligence gives effect to the employee's retaliatory animus and causes the victim to suffer an adverse employment decision. As a result, we vacate the court's decision and remand for further proceedings.

**BACKGROUND**[1]

In July 2013, Andrea Vasquez was hired by Empress Ambulance Service, Inc. ("Empress") to work as an emergency medical technician on an ambulance crew. In October of that year, Vasquez met Tyrell Gray, who worked for Empress as a dispatcher and who almost immediately began making romantic overtures to Vasquez. Over the course of their acquaintance, Gray "constantly asked [Vasquez] out on dates," "attempted to flirt with her," and "repeatedly . . . put his arm around her or touched her shoulders," causing Vasquez "to be extremely uncomfortable" as she tried to reject his advances. App'x 9.

This conduct came to a head in January 2014. On January 8, while Vasquez and Gray both worked in Empress's office, Gray approached Vasquez, placed his arm around her, and asked "When are you going to let me take you out?" App'x 9. When Vasquez replied that she had a boyfriend and was not interested in a romantic relationship, Gray insisted that "I bet I can make you leave your man" and promised to "send . . . something between you and me." App'x 9. Around midnight that night, while out on shift, Vasquez received a picture message from Gray: a photograph of his erect penis, captioned "Wat u think." App'x 9-10. Vasquez did not respond to this message or to a follow-up text message from Gray as she continued her work. When Vasquez returned to the office at the

---

[1] Because this appeal involves review at the motion to dismiss stage, we base this factual background on the allegations contained in Vasquez's complaint, which we assume to be true. *See Littlejohn v. City of New York*, 795 F.3d 297, 303 n.1 (2d Cir. 2015).

3

conclusion of her shift, however, she was "extremely embarrassed, distraught, and crying." App'x 10. And she promptly informed an Empress field supervisor about Gray's conduct. Promising that "[w]e're going to deal with this," the supervisor walked Vasquez to a computer in Empress's office and asked that she compose and send a formal complaint right away, which Vasquez began to do. App'x 10.

As Vasquez was writing her complaint, however, Gray entered the room "to see a visually distressed [Vasquez] crying and typing at the computer." App'x 10. Gray, "noticeably nervous," asked Vasquez "if she was ok" and, after Vasquez declined to engage his attempts at conversation, stated, "You're reporting me, right?" App'x 10. Gray then went out of the room and ran into another emergency medical technician, Almairis Zapata, with whom he began discussing Vasquez's likely complaint. He asked Zapata, as "a favor," because he was "afraid he was going to lose his job," to "lie for [him]" and tell their supervisors that Vasquez and Gray had been in a romantic relationship." App'x 11. Zapata refused, and Gray left the building.

After Gray's departure, Vasquez finished writing her complaint, in which she explained that she felt "violated" and "disrespected" as a result of Gray's behavior. She then waited in Empress's office until Sheri Baia, one of her supervisors, and Elizabeth Shepard, a member of the human resources department, arrived to discuss what had happened. The supervisors thanked Vasquez for "telling [her] story," assured her that "[w]e don't tolerate this sort of behavior here," and promised to "sort the situation out." App'x 12. To aid in their investigation, Vasquez offered to show the supervisors Gray's messages on her cell phone, but they rejected her offer. They then asked Vasquez whether

4

she preferred to go home or to wait in the office while they investigated the incident that morning, and Vasquez elected to wait.

Gray, meanwhile, had not finished seeking to undermine the accusations he anticipated from Vasquez. Rather, in the intervening hours, Gray "manipulated a text message conversation on his iPhone to make it appear as though a person with whom he had legitimately been engaging in consensually sexual text banter was [Vasquez]." App'x 12. He then "took screen shots of portions of the conversation, printed them off," and "presented it to the management" of Empress as evidence that he and Vasquez had been in a consensual sexual relationship. App'x 12.

By the time Vasquez met with a committee of her union representative, Empress's owner, and Shepard to discuss the incident later that morning, the committee had already considered Gray's documents and had concluded that Vasquez was "having an inappropriate sexual relationship" with Gray. App'x 13. Shepard informed Vasquez that Empress "kn[e]w the truth," as they had spoken with Gray and had seen his "proof" of her improper conduct by means of "pictures and text messages." App'x 13. In particular, Shepard reported that Gray had shown them "a racy self-taken photo" that Vasquez had allegedly sent in response to Gray's explicit picture message, which they considered "proof that [Vasquez] had been sexually harassing [Gray]." App'x 13. Vasquez "adamantly denied" Shepard's allegations and asserted that Gray was lying, but Shepard insisted that "the committee had all seen the photograph" and "kn[ew] it was [her in the photo]." App'x 13. She made this assertion even though, in fact, the photo depicted only "a small fraction of a face" that could "by no means [be] concluded to be that of [Vasquez]." App'x 13. When Vasquez asked to see the photograph, moreover, Shepard refused. Likewise, when

5

Vasquez again offered again to show the committee her own cell phone, in an attempt to prove that no such messaging had occurred, the committee declined. They then fired Vasquez for engaging in sexual harassment.

Vasquez subsequently brought suit against Empress[2] under Title VII and NYSHRL, claiming that Empress had wrongfully terminated her in retaliation for complaining of sexual harassment. Empress moved to dismiss Vasquez's complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6) and the district court (Buchwald, *J.*) granted the motion, holding that Gray's retaliatory intent could not be attributed to Empress and that, therefore, Empress could not have engaged in retaliation against Vasquez. Vasquez now appeals.

**DISCUSSION**

We review *de novo* a district court's grant of a motion to dismiss under Rule 12(b)(6), accepting as true all factual allegations contained in the complaint and drawing all inferences in the plaintiff's favor. *Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). In addition, "for a retaliation claim to survive . . . a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against [her], (2) because [s]he has opposed any unlawful employment practice." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (internal quotation marks omitted). Under the latter element, a

---

[2] Vasquez also filed suit against Gray individually, but later consented to dismissal without prejudice of the claims against him, in response to an issue about service. App'x 41.

6

plaintiff must show a "retaliatory purpose" by "plausibly plead[ing] a connection between the [adverse] act and [the plaintiff's] engagement in protected activity."  *Id.*[3]

**A.  "Cat's Paw" Liability**

Vasquez seeks to recover against Empress under what has been termed "cat's paw" liability.  The phrase derives from an Aesop fable, later put into verse by Jean de La Fontaine, in which a wily monkey flatters a naïve cat into pulling roasting chestnuts out of a roaring fire for their mutual satisfaction; the monkey, however, "devour[s]. . . them fast," leaving the cat "with a burnt paw and no chestnuts" for its trouble.  "[I]njected into United States employment discrimination law by [Judge Richard] Posner in 1990," *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011), the "cat's paw" metaphor now "refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action," *Cook v. IPC Intern. Corp.*, 673 F.3d 625, 628 (7th Cir. 2012) (Posner, *J.*).  Because the supervisor, acting as agent of the employer, has permitted himself to be used "as the conduit of [the subordinate's] prejudice," *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990), that prejudice may then be imputed to the employer and used to hold the employer liable for employment discrimination.  In other words, by merely effectuating or "rubber-stamp[ing]" a discriminatory employee's "unlawful design," *Nagle v. Marron*, 663 F.3d 100, 117 (2d Cir. 2011), the employer plays the credulous cat to the malevolent monkey and, in so doing, allows itself to get burned—i.e., successfully sued.

---

[3] Because "[t]he standards for evaluating . . . retaliation claims are identical under Title VII and the NYSHRL," our analysis does not distinguish between Vasquez's federal and state claims. *Kelly v. Howard I. Shapiro & Assoc. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013).

7

"To date, our Circuit has neither accepted nor rejected the cat's paw approach." *Nagle*, 663 F.3d at 118; *see also Wright v. City of Syracuse*, 611 F. App'x 8, 11 n.2 (2d Cir. 2015). The Supreme Court, however, has approved its application under the Uniformed Services Employment and Reemployment Rights Act, a statute "very similar to Title VII," *Staub*, 562 U.S. at 417, and our sister circuits have overwhelmingly adopted the theory in Title VII retaliation cases. *See, e.g.*, *Zamora v. City of Houston*, 798 F.3d 326, 332-33 (5th Cir. 2015); *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1069-70 (6th Cir. 2015); *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 551-52 (8th Cir. 2013); *Hicks v. Forest Preserve Dist. of Cook Cty., Ill.*, 677 F.3d 781, 789-90 (7th Cir. 2012); *McKenna v. City of Philadelphia*, 649 F.3d 171, 180 (3d Cir. 2011). Further, permitting "cat's paw" recovery in retaliation cases accords with longstanding precedent in our Court, in the employment-discrimination context, that "a Title VII plaintiff is entitled to succeed, 'even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the [decisionmaking] process.'" *Holcomb v. Iona Coll.*, 521 F.3d 130, 143 (2d Cir. 2008) (quoting *Bickerstaff v. Vassar Coll.*, 196 F. 3d 435, 450 (2d Cir. 1999)). Such a role is surely played by an employee who "manipulates" an employer into acting as mere "conduit" for his retaliatory intent.[4] Accordingly, we now hold that the

---

[4] We note that the parties do not dispute on appeal whether Vasquez has adequately pled Gray's retaliatory intent. In any event, we conclude that Vasquez's allegations are more than sufficient to meet her minimal burden plausibly to plead Gray's retaliatory intent. To do so, she need only plausibly plead that: (1) Gray desired his actions to cause, or knew that his actions were substantially certain to result in, adverse employment action for Vasquez, *see Staub*, 562 U.S. at 422 n.3; and (2) he took those actions "because [s]he ha[d] made a charge" of sexual harassment, 42 U.S.C. § 2000e-3(a) — i.e., he would not have taken those actions if Vasquez had not filed a complaint with human resources, *see Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) (holding that "but-for" causation is the proper standard for claims of retaliation under Title VII).

8

"cat's paw" theory may be used to support recovery for claims of retaliation in violation of Title VII.

**B. Co-Workers and Cat's Paw(s)**

The mere availability of "cat's paw" liability in Title VII retaliation cases, however, does not resolve whether Empress may be held to the fire for its reliance on Gray's retaliatory information. While the Supreme Court has approved holding an employer liable for the retaliatory intent of one of its "supervisors" under a "cat's paw" theory, it specifically "express[ed] no view as to whether the employer would be liable if a co-worker, rather than a supervisor, committed a discriminatory act that influenced the ultimate employment decision." *Staub*, 562 U.S. at 422 n.4. We must therefore determine in the first instance under what circumstances the "cat's paw" approach will render an employer responsible for the animus of a low-level employee who works alongside the victim.

To do so, "[w]e turn to general principles of agency law, for the term 'employer' is defined under Title VII to include 'agents'" and "Congress has directed federal courts to interpret Title VII based on agency principles." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998); *see also Staub*, 562 U.S. at 418 (deriving cat's paw liability from "general principles of . . . agency law"). As set out by the Supreme Court in *Ellerth*, speaking in a hostile work environment case, there are four circumstances in which "agency principles impose liability on employers even where employees commit torts outside the scope of employment," and would not ordinarily be deemed "agents" of the employer:

    (a) the master intended the conduct or the consequences, or
    (b) the master was negligent or reckless, or
    (c) the conduct violated a non-delegable duty of the master, or

9

(d) the servant purported to act or to speak on behalf of the principal where there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

*Ellerth*, 524 U.S. at 758 (quoting Restatement (Second) of Agency § 219(2) (1957)).

Significantly, in addressing employer culpability for employee misconduct, the *Ellerth* Court expressly noted that Section 219(2)(b) holds employers liable "when the [employee's] tort is attributable to the employer's own negligence. Thus, although a[n] employee's] sexual harassment is outside the scope of employment . . ., an employer can be liable, nonetheless, where its own negligence is a cause of the harassment[, . . . i.e.,] if it knew or should have known about the conduct and failed to stop it." *Id.* at 758-59.[5]

We see no reason why *Ellerth*, though written in the context of hostile work environment, should not also be read to hold an employer liable under Title VII when, through its own negligence, the employer gives effect to the retaliatory intent of one of its—even low-level—employees.[6] Not surprisingly, another circuit court has already determined, in reliance on *Ellerth*, that a discriminatory termination claim can proceed

---

[5] We note that a new Restatement of Agency has been published since the Supreme Court decided *Ellerth*, which discusses employer liability for employee torts committed outside the scope of employment in a somewhat different way. *See* Restatement (Third) of Agency § 2.04. Because both parties rely on the language of the Second Restatement as embodied in *Ellerth*, however, we likewise use that Restatement's formulation of agency principles to guide our analysis. In any event, the Third Restatement continues to hold employers responsible for harm caused by employees as a result of the employer's negligence. See Restatement (Third) of Agency § 7.05; *id.* cmt. b.

[6] We decline Empress's invitation to find that Vasquez failed to raise this argument below and to deem the issue forfeited. At the district court, Vasquez argued that Gray's retaliatory intent should be imputed to Empress under a "cat's paw" theory and that the patent insufficiency of Empress's investigation supported imposition of employer liability. *See also* Supp. App'x 114 (stating, at oral argument before the district court, that "the adequacy of the investigation is intertwined with the cat's paw theory of liability," as determined by "a negligen[ce] standard"). Although Vasquez failed to articulate precisely that the insufficiency of the investigation constituted negligence and that such negligence permitted imputation of Gray's intent, we believe her arguments sufficed to raise the issue we address here. Regardless, "the rule against considering arguments raised for the first time on appeal is prudential, not jurisdictional, and we are free to exercise our discretion to consider waived arguments . . . where[, as here,] an argument presents a question of law and does not require additional fact finding." *United States v. Brunner*, 726 F.3d 299, 304 (2d Cir. 2013) (internal quotation marks and citations omitted).

against an employer who negligently permitted the plaintiff's co-worker, a low-level employee harboring discriminatory intent, to induce the plaintiff's termination. In *Velazquez-Perez v. Developers Diversified Realty Corp.*, the First Circuit explained that the "conclusion that [a biased employee] was not a supervisor d[id] not necessarily absolve [the employer] of potential liability for [the plaintiff's] discharge," because there was "no basis" to believe that *Ellerth*'s acceptance of "employer liability premised on a finding of negligence" should be limited either to "cases of 'hostile workplace' discrimination" or to supervisory employees. 753 F.3d 265, 273 (1st Cir. 2014).[7] It consequently held that "an employer can be held liable under Title VII if: the plaintiff's co-worker makes statements maligning the plaintiff, for discriminatory reasons and with the intent to cause the plaintiff's firing; the co-worker's discriminatory acts proximately cause the plaintiff to be fired; and the employer acts negligently by allowing the co-worker's acts to achieve their desired effect though it knows (or reasonably should know) of the discriminatory motivation." *Id.* at 274.

We agree with the First Circuit, and therefore conclude that Vasquez can recover against Empress if Empress was itself negligent in allowing Gray's false allegations, and the retaliatory intent behind them, to achieve their desired end. Assuming that Empress knew or should have known of Gray's retaliatory animus, the fact that "Gray was nothing more than . . . a low-level employee with no supervisory or management authority," Appellee's

---

[7] *See also id.* ("Suppose, for example, that a white employee repeatedly taunts a black co-worker with vicious racial epithets and also lodges a series of false complaints about the victim to their supervisor in a racially motivated attempt to have the victim fired. Certainly the employer could be held liable for negligently permitting the taunting. So, too, the employer should be liable if it fires the victim based on complaints that it knew (or reasonably should have known) were the product of discriminatory animus. In either situation, the same elements are present: an act of discrimination is allowed to cause harm by an employer that knows or reasonably should know of the discrimination.")

11

Br. 18, cannot shield Empress from answering for Gray's conduct because Empress's own negligence provides an independent basis, under *Ellerth* and agency law, to treat Gray as Empress's agent and hold Empress accountable for his unlawful intent. Once deemed Empress's agent, Gray stands in the same shoes as *Staub*'s "supervisor," and is equally able to play the monkey to Empress's cat. *See Staub*, 562 U.S. at 421 ("The employer is at fault [in a cat's paw case] because *one of its agents* committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision.") (emphasis added).

Such a negligence-based approach to "cat's paw" liability, moreover, fully comports with established Title VII caselaw in our Circuit requiring that a biased non-decisionmaker play a "meaningful role" in an adverse employment decision for the unbiased decisionmaker to be culpable. *See Bickerstaff*, 196 F. 3d at 450 ("We recognize that the impermissible bias of a single individual at any stage . . . may taint the ultimate employment decision in violation of Title VII. This is true even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the [decisionmaking] process."). Empress's alleged negligence—in crediting Gray's accusations to the exclusion of all other evidence, and specifically declining to examine contrary evidence tendered by Vasquez, when it knew or, with reasonable investigation, should have known of Gray's retaliatory animus—caused Gray's accusations to form the sole basis for Empress's decision to terminate Vasquez. Thus, as a result of Empress's negligence, Gray achieved a "meaningful," and indeed decisive, role in Vasquez's termination. Put differently, while Gray might, on other facts, have played no greater part than that of a mere "informant" or

"witness at a bench trial," *Vasquez v. Empress Ambulance Serv., Inc.*, 14 Civ. 8387, 2015 WL 5037055, at *6 (S.D.N.Y. Aug. 26, 2015) (quoting *Staub*, 562 U.S. at 421), who simply offered information for the decisionmaker's examination, on the facts before us, viewed in the light most favorable to Vasquez, Gray became the entire case against Vasquez when Empress negligently chose to credit his, and only his, account.

We emphasize that such an approach should not be construed as holding an employer "liable simply because it acts on information provided by a biased co-worker." *Id.* As we have long held, when considering the legitimacy of an employer's reason for an employment action, we look to "what '*motivated*' the employer" rather than to "the truth of the allegations against [the] plaintiff" on which it relies. *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006); *see also Jones*, 796 F.3d at 330 ("[S]howing that an employer incorrectly found an employee guilty of misconduct is insufficient to prove retaliation . . . ."). Thus, an employer who, non-negligently and in good faith, relies on a false and malign report of an employee who acted out of unlawful animus cannot, under this "cat's paw" theory, be held accountable for or said to have been "motivated" by the employee's animus. And, of course, an employer who negligently relies on a low-level employee's false accusations in making an employment decision will not be liable under Title VII unless those false accusations themselves were the product of discriminatory or retaliatory intent (although the employer may yet be liable for simple negligence under state law).

Only when an employer in effect adopts an employee's unlawful animus by acting *negligently* with respect to the information provided by the employee, and thereby affords that biased employee an outsize role in its own employment decision, can the employee's motivation be imputed to the employer and used to support a claim under Title VII. Put

13

simply, an employer can still "just get it wrong" without incurring liability under Title VII, Supp. App'x 114, but it cannot "get it wrong" without recourse if in doing so it negligently allows itself to be used as conduit for even a low-level employee's discriminatory or retaliatory prejudice.

Having determined that Vasquez can recover against Empress if Empress negligently gave effect to Gray's retaliatory animus, we need now only decide whether Vasquez has sufficiently pled that Empress acted negligently in its treatment of Gray's and Vasquez's accusations. Although Vasquez does not use the term "negligence" in her complaint, we conclude that she has pled facts from which a reasonable person could infer that Empress knew or should have known that Gray's accusations were the product of retaliatory intent and thus should not have been trusted. First, the fact that Gray had just learned that he had been accused by Vasquez of sexual harassment provided Gray with an obvious reason to lie and paint Vasquez as the perpetrator rather than the victim. With Gray more closely resembling a vengeful suspect than an independent informant, Empress had cause to treat with some skepticism his "he-said, she-said" cross-accusations. In addition, as Vasquez notes, "the timing . . . is also suspicious," Appellant's Br. 20: it seems unlikely that Vasquez should go from eagerly trading explicit messages to reporting such conduct as unwelcome harassment within the space of only six hours. It likewise seems strange that the very morning Gray is accused by Vasquez of harassment he should, when questioned by Empress, just happen to have on hand printed copies of amorous text messages purportedly received from Vasquez to substantiate his claim that she initiated the inappropriate exchange. Moreover, those messages themselves, viewed in the light most favorable to Vasquez, provide reason to distrust Gray's account: according to Vasquez's

14

complaint, the racy picture message "was by no means unequivocally of [Vasquez]," as it showed only "a small fraction of a face which can by no means [be] concluded to be that of [Vasquez]." App'x 13.[8] Empress, however, chose to ignore these warning signs and instead blindly credited Gray's assertions, obstinately refusing to inspect Vasquez's phone or to receive any other evidence proffered by Vasquez in refutation. Accordingly, accepting Vasquez's allegations as true, we conclude that a reasonable jury could find that Empress acted negligently in terminating Vasquez solely on the basis of Gray's accusations.

In sum, we hold that an employer may be held liable for an employee's animus under a "cat's paw" theory, regardless of the employee's role within the organization, if the employer's own negligence gives effect to the employee's animus and causes the victim to suffer an adverse employment action. Because Vasquez has plausibly alleged that Empress's negligence permitted Gray's retaliatory intent to achieve its desired effect—her termination—her claims for retaliation against Empress may proceed.

**CONCLUSION**

For the foregoing reasons, we VACATE the judgment of the District Court and REMAND the case for further proceedings consistent with this opinion.

---

[8] In support of its motion to dismiss, Empress attached a copy of the text-message exchange provided by Gray, but the district court does not appear to have considered the document in reaching its judgment, and we therefore do not rely on the document to support our conclusion here. We note, however, that were we to consider the text-message printout as a document incorporated by reference in Vasquez's complaint, *see DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir. 2010), we would find additional fodder to support the inference that Empress should not have believed Gray's account: for instance, the exchange indicates that Gray's texting partner was "[a]sleep" at 12:03 AM on January 9th, a time when Vasquez was actually on shift working for Empress. *See* Supp. App'x 39.