IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

STATE OF FLORIDA,
DEPARTMENT OF
CORRECTIONS,

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

      Appellant,

CASE NO. 1D16-149

v.

CAROLANN BRACEWELL
AND TED JETER,

      Appellees.

_____/

Opinion filed May 19, 2017.

An appeal from the Circuit Court for Leon County.
James C. Hankinson, Judge.

Jeffrey Slanker and Robert J. Sniffen of Sniffen & Spellman, P.A., Tallahassee, for
Appellant.

Marie A. Mattox and Erika Esan Goodman of Marie A. Mattox, P.A., Tallahassee,
for Appellees.


PER CURIAM.

      The Florida Department of Corrections (DOC) appeals a final judgment in

favor of Carolann Bracewell and Ted Jeter (Appellees) following a jury trial on their

complaint for violation of the Florida public sector Whistle-blower's Act (FWA).

Appellees alleged that DOC terminated their employment in retaliation for complaints they made to DOC's Office of the Inspector General (OIG) concerning one of its inspectors. Acknowledging that the decision makers at DOC who terminated Appellees' employment did not harbor any retaliatory animus, Appellees proceeded under a cat's paw theory of liability to hold DOC vicariously liable for the biased actions of the OIG inspector. On appeal, DOC argues that the trial court erred in denying DOC's motions for a directed verdict and for judgment in accordance with motion for directed verdict. Because we agree with DOC that the cat's paw theory of liability is inapplicable in this case as a matter of law, we reverse and remand for the trial court to enter judgment in favor of DOC.

I.

Jeter was the Warden at Jackson Correctional Institution (JCI) and Bracewell was the Assistant Warden. In July of 2011, two inmates sought medical attention from JCI's infirmary. The inmates were kept in the infirmary over the weekend and were admitted to a hospital the following Monday. Following one of the inmate's complaint alleging he had received poor medical treatment, the OIG assigned inspector Julie Mader to investigate the matter.

Soon thereafter, Appellees complained several times to Mader's supervisors about the way she was conducting the investigation and also accused her of HIPAA violations and improperly accessing the driving records and history of Jeter and his

2

brother. As a result of Appellees' complaints, the OIG removed Mader from the investigation in December of 2011 and assigned two new inspectors, Louis Cordova and Michael Harrison, to the on-going investigation. Although Mader was no longer permitted to actively participate in the investigation, she did confer with Cordova and Harrison and provided them with clerical assistance, including typing summaries of recordings of witness interviews for the final investigative report. Mader had interviewed some witnesses by the time Cordova and Harrison took over the investigation, but the majority of the interviews were conducted by the new inspectors who also interviewed Appellees. In addition, Cordova and Harrison were responsible for reviewing the accuracy of all witness interview summaries prepared by Mader before they were included in the final report.

Through their investigation, Cordova and Harrison determined that Appellees, along with other DOC employees, committed numerous violations of DOC policies. The general content, specific findings, and final conclusions of the report were reached solely by Cordova and Harrison. The report did not include disciplinary recommendations for any of DOC's employees.

In March of 2012, Cordova and Harrison submitted their report to the then-Secretary of the DOC, Kenneth Tucker. Deputy DOC Secretary Michael Crews and Assistant DOC Secretary over Institutions Tim Cannon reviewed the OIG's report and made recommendations to Secretary Tucker. Secretary Tucker was the decision

maker who determined what, if any, tangible employment action would be taken against DOC employees who were found to have violated DOC policies. Ultimately, Secretary Tucker terminated Appellees' employment in May of 2012.

Appellees filed a civil complaint against DOC alleging a single violation of the FWA. Because there was no evidence of retaliatory bias by those DOC employees who were involved in the decision to terminate Appellees (namely, Secretary Tucker, Deputy Secretary Crews, and Assistant Secretary Cannon), Appellees relied on the cat's paw theory alleging that DOC was vicariously liable for the biased actions of OIG inspector Mader. Appellees claimed that Mader harbored retaliatory bias against them for reporting her misconduct during the investigation and that she acted with the intent to cause DOC to terminate Appellees by influencing the OIG's final report. Thus, according to Appellees, Mader's bias should be imputed to DOC decision makers because DOC relied on the OIG's tainted investigation when making the final decision to terminate Appellees.

DOC moved for a directed verdict at the close of Appellees' case and again at the close of all evidence. Regarding the cat's paw theory, DOC argued that in order to find liability, the law required the decision maker to "rubber-stamp" the recommendations of the individual with the biased retaliatory motive, and there was no evidence that Mader or anyone at the OIG made any disciplinary recommendations. The trial court denied both motions. The jury returned a verdict

4

in favor of Appellees, and DOC moved for a new trial and for judgment in accordance with the motions for directed verdict. In addition to its previous arguments regarding the cat's paw theory, DOC argued that the replacement of Mader with inspectors Cordova and Harrison removed any potential taint and that even if the cat's paw theory could apply, there was no evidence that the alleged actions of Mader were the proximate cause of Appellees' termination. Relying on *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), DOC also argued that none of the OIG employees were Appellees' supervisors or had the authority to take any tangible employment action against Appellees, and OIG's investigation was independent from DOC's decision makers. The trial court denied those motions as well.

## II.

This Court reviews denials of motions for directed verdicts and motions for judgment in accordance with motions for directed verdict de novo. *New Jerusalem Church of God, Inc. v. Sneads Cmty. Church, Inc.,* 147 So. 3d 25, 28 (Fla. 1st DCA 2013). The evidence must be viewed in the light most favorable to the non-moving party and every reasonable conclusion must be construed favorably to the non-movant. *Johnson v. Swerdzewski,* 935 So. 2d 57, 60 (Fla. 1st DCA 2006).

## III.

The FWA makes it unlawful for an employer to retaliate against an employee because the employee has engaged in conduct protected by the statute. *Robinson v.*

5

*Dep't. of Health*, 89 So. 3d 1079, 1081 (Fla. 1st DCA 2012) (citing §§ 112.3187(8)(a); 112.31895, Fla. Stat.). At trial, Appellees did not contend that the decision makers in this case – Secretary Tucker, Deputy Secretary Crews, and Assistant Secretary Cannon – were personally motivated by retaliatory animus in their decision to terminate Appellees. Rather, Appellees' position was that Mader used these decision makers as a "cat's paw" to effectuate her retaliatory intent.

The "cat's paw" metaphor derives from a seventeenth-century French fable involving a conniving monkey who convinces a cat to reach into a fire to retrieve roasting chestnuts. The cat burns its paws in the process and the monkey escapes unscathed with the chestnuts. In the employment law context, cat's paw liability refers to a situation in which a biased subordinate, who lacks decisionmaking power, "clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers." *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998). "In other words, by merely effectuating or 'rubber-stamp[ing]' a discriminatory employee's 'unlawful design,' the employer plays the credulous cat to the malevolent monkey and, in so doing, allows itself to get burned—i.e., successfully sued." *Vasquez v. Empress Ambulance Serv., Inc.,* 835 F.3d 267, 272 (2d Cir. 2016) (citation omitted).

Relatively recently, the United States Supreme Court approved the application of the cat's paw theory in an employment discrimination case involving the

Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. § 4311, a statute "very similar to Title VII." *Staub v. Proctor Hosp.*, 562 U.S. 411, 417 (2011). In *Staub*, the Court considered "the circumstances under which an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision." *Id.* at 413. Applying general principles of agency law, the Court held that a plaintiff may establish cat's paw liability under USERRA "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action." *Id.* at 422 (footnote omitted).[1]

## A.

As a threshold matter, DOC argues that it cannot be held liable in this case under a cat's paw theory of liability because Mader did not hold a supervisory role relative to Appellees. In support of its position, DOC emphasizes that the Supreme Court expressly limited its holding in *Staub* to the discriminatory acts of a *supervisor*

---

[1] Both parties submit that the standard in *Staub* is instructive in this case because the FWA is analyzed in accordance with Title VII. However, neither party addressed the extent to which the Supreme Court's decision in *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013), holding that but-for causation is the standard for proving retaliation in a Title VII case, alters the analysis in a cat's paw case.

as the proverbial monkey. 562 U.S. at 422 n.4 (noting that "[w]e express no view as to whether the employer would be liable if a co-worker, rather than a supervisor, committed a discriminatory act that influenced the ultimate employment decision"). To be precise, the Court actually left the question open for another day. The issue of which biased employees may subject their employer to cat's paw liability has been percolating in the lower federal courts since with no definitive consensus emerging.

B.

In evaluating the vicarious liability of an employer under the cat's paw theory, the Court in *Staub* was guided by general principles of agency law. 562 U.S. at 421. The Court elaborated on the limiting principles of agency law by noting that an employer is liable under cat's paw causation only "when the supervisor acts within the scope of his employment, or when the supervisor acts outside the scope of his employment and liability would be imputed to the employer under traditional agency principles." *Id.* at 422 n.4 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 758 (1998)). In *Ellerth*, the Court had previously defined the bounds of vicarious liability in Title VII cases as encompassing employer liability for the acts of its employees holding supervisory positions or other actual power to make tangible employment decisions. *Id.* at 762 (holding that "[a]s a general proposition, only a supervisor, or other person acting with the authority of the company," can undertake a tangible employment action).

Subsequently, in *Vance v. Ball State University*, the Court answered the question left unresolved by *Ellerth*: "who qualifies as a 'supervisor' in a case in which an employee asserts a Title VII claim for workplace harassment?" 133 S. Ct. 2434, 2439 (2013). The Court held that

> an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."

*Id.* at 2443 (quoting *Ellerth*, 524 U.S. at 761). In setting the legal background for its analysis, the Court noted that "an employer is directly liable for an employee's unlawful harassment if the employer was negligent with respect to the offensive behavior," and that courts generally apply that rule "when a co-worker harasses the plaintiff." *Id.* at 2441. When a supervisor is the harasser, different rules apply and "an employer may be vicariously liable." *Id.* (emphasis omitted). In its analysis, the Court noted that its decision in *Ellerth* recognized that "'most workplace tortfeasors are aided in accomplishing their tortious objective by the existence of the agency relation,' and consequently 'something more' is required in order to warrant vicarious liability." *Id.* at 2447-48. The Court explained its position that negligence was the more appropriate claim when the harassing employee is not a supervisor as follows:

9

> The ability to direct another employee's tasks is simply not sufficient. Employees with such powers are certainly capable of creating intolerable work environments, . . . , but so are many other co-workers. Negligence provides the better framework for evaluating an employer's liability when a harassing employee lacks the power to take tangible employment actions.

*Id.* at 2448 (internal citation to dissent omitted). In response to the plaintiff's contention that the Court's definition of supervisor status would "encourage employers to attempt to insulate themselves from liability for workplace harassment by empowering only a handful of individuals to take tangible employment actions," the Court explained:

> As an initial matter, an employer will always be liable when its negligence leads to the creation or continuation of a hostile work environment. And even if an employer concentrates all decisionmaking authority in a few individuals, it likely will not isolate itself from heightened liability under *Faragher* and *Ellerth*. *If an employer does attempt to confine decisionmaking power to a small number of individuals, those individuals will have a limited ability to exercise independent discretion when making decisions and will likely rely on other workers who actually interact with the affected employee. Under those circumstances, the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies.*

*Id.* at 2452 (citations omitted) (emphasis added).[2]

---

[2] We specifically do not address whether an employer may be held liable for an employee's retaliatory intent, regardless of the employee's role within the organization, under a negligence-based approach to cat's paw liability. *See Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 273-74 (2d Cir. 2016) (holding that an employer may be liable under Title VII "when, through its own negligence, the employer gives effect to the retaliatory intent of one of its – even low-level – employees"). Such a theory was not advanced in this case.

10

Turning back to the case at hand, Appellees have not directed this Court to any case of precedential value that has extended the outer contours of vicarious liability beyond a supervisor or a subordinate with authority to recommend or take tangible employment action. As persuasive authority for their position, Appellees rely on an unreported decision by the United States District Court for the Middle District of Alabama to support their argument that cat's paw liability is appropriate in this case. *See Shirley v. Hyundai Motor Mfg. Ala., LLC,* No. 2:15cv346-WHA, 2016 WL 3007139 (M.D. Ala. May 24, 2016). In that case, the plaintiff's co-worker complained of racial discrimination to Hyundai's Team Relations Department. *Id.* at *2. That department conducted an investigation and prepared a memo confirming the co-worker's allegations, but it did not make any disciplinary recommendations. *Id.* The memo was reviewed by the head of the Human Resources Department who then decided to demote the plaintiff. *Id.* at *3. Relying on the cat's paw theory, the plaintiff alleged that the memo was drafted by a biased non-supervisory investigator within the Team Relations Department who manipulated the head of the Human Resources Department into taking disciplinary action against the plaintiff. *Id.* at *4. Although the court denied a summary judgment motion for the employer, there is no analysis of agency principles of liability and the decision does not mention the Supreme Court's decision in *Staub. See id.* at *6. Nor is there any discussion of the organizational hierarchy or interrelationship between the two departments at

11

Hyundai, though it appears that they were within the same chain of command. *Id.*

IV.

Applying the cat's paw theory of liability to the facts of this case would require us to stretch the bounds of existing authority in a manner that would arguably have no limiting principles. While Mader was involved in the investigation of Appellees' misconduct at some level, she was not Appellees' supervisor, she did not have apparent or delegated authority to take tangible employment action against Appellees, and she was not empowered by DOC or the OIG to make findings of fact or recommendations regarding Appellees' discipline. Stated differently, there was nothing provided by Mader for DOC to rubber-stamp or blindly follow, and therefore any retaliatory animus that she possessed could not have resulted in vicarious liability to DOC under the cat's paw theory. Because the trial court erred in denying DOC's motions, we reverse and remand the case for entry of a judgment in favor of DOC. This ruling renders moot the remaining issue on appeal.

REVERSED and REMANDED.

WOLF, RAY, and MAKAR, JJ., CONCUR.

12