18-1556-cv (L)
*Naumovski v. Norris*

# In the
# United States Court of Appeals
## for the Second Circuit

---

AUGUST TERM 2018

No. 18-1556-cv
No. 18-2663-cv

ELIZABETH NAUMOVSKI
*Plaintiff-Appellee,*

v.

JAMES NORRIS AND NICOLE SCHOLL,
*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Northern District of New York

---

ARGUED: JUNE 18, 2019
DECIDED: AUGUST 12, 2019

---

Before: WINTER, CABRANES, and RAGGI, *Circuit Judges.*

---

Defendants-Appellants James Norris and Nicole Scholl (jointly, "Defendants") appeal from an April 17, 2018 order of the United States District Court for the Northern District of New York (David N. Hurd, *Judge*), denying in part their motion for summary judgment. Defendants, who are athletics officials at Binghamton University, the State University of New York ("Binghamton"), claim that they were erroneously denied qualified immunity in a suit brought by Plaintiff-Appellee Elizabeth Naumovski, previously an assistant women's basketball coach at Binghamton. Because the District Court erroneously conflated the distinct Title VII and § 1983 standards for both vicarious liability and causation, we **REVERSE** the District Court's order with respect to the § 1983 claims against Defendants, we **ENTER** judgment for Defendants, and we **REMAND** the cause for further proceedings consistent with this opinion.

---

MARGARET JOANNE FOWLER (Jared R, Mack, *on the brief*), Levene Gouldin & Thompson, LLP, Vestal, NY, *for Defendants-Appellants*.

A.J. BOSMAN, Bosman Law Firm L.L.C., Rome, NY, *for Plaintiff-Appellee.*

---

JOSÉ A. CABRANES, *Circuit Judge*:

We consider here whether the termination of an employee, allegedly in response to malicious rumors of sexual misconduct, can

2

support claims for sex discrimination. In principle, such claims may well be viable, particularly under the broad statutory cause of action provided by Title VII of the Civil Rights Act of 1964 ("Title VII"). The claims before us on appeal, however, were brought pursuant to 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment. The standards for such claims, particularly with respect to vicarious liability and causation, are distinct from those brought under Title VII. Moreover, Defendants in this case had the additional benefit of qualified immunity, which the District Court did not address independently. Accordingly, we write to clarify the differences between discrimination claims brought under Title VII and those brought under § 1983, and to again emphasize the importance of properly applying the doctrine of qualified immunity.

Defendants-Appellants James Norris and Nicole Scholl ("Norris" and "Scholl"; jointly, "Defendants") appeal from an April 17, 2018 order of the United States District Court for the Northern District of New York (David N. Hurd, *Judge*), denying in part their motion for summary judgment. Defendants, who are athletics officials at Binghamton University, the State University of New York ("Binghamton"), claim that they were erroneously denied qualified immunity in a discrimination suit brought by Plaintiff-Appellee Elizabeth Naumovski ("Naumovski" or "Plaintiff"), previously an assistant women's basketball coach at Binghamton. Because the District Court erroneously conflated the distinct Title VII and § 1983 standards for both vicarious liability and causation, we **REVERSE** the District Court's order with respect to the § 1983 claims against

3

Defendants, we **ENTER** judgment for Defendants, and we **REMAND** the cause for further proceedings consistent with this opinion.

## 1. BACKGROUND[1]

### A. *The 2008-2009 Season: Rumors Begin*

In June 2008, Elizabeth Naumovski, a Canadian citizen, began her employment at Binghamton as an assistant coach of its women's basketball team. During the 2008-2009 season, Naumovski worked as one of the team's three assistant coaches under the direction of head coach Nicole Scholl.

In December 2008, rumors began to circulate among student-athletes and their families that Naumovski was engaged in an "inappropriate relationship" with a gay, female student-athlete, identified as "J.W." Naumovski first learned of these rumors in January 2009, which was about the same time they reached Scholl. But according to Scholl, the rumors never referred to a sexual relationship between Naumovski and J.W.; rather, they merely suggested that Naumovski was demonstrating "favoritism" toward J.W. Moreover, Scholl claims that she never believed Naumovski was having an intimate or sexual relationship with J.W.

---

[1] In setting forth the facts, "[w]e construe the evidence in the light most favorable to [Naumovski] and draw all reasonable inferences in [her] favor." *ING Bank N.V. v. M/V TEMARA*, 892 F.3d 511, 518 (2d Cir. 2018).

Naumovski recalls discussing allegations of an inappropriate *sexual* relationship with Scholl.[2] Naumovski further recalls Scholl reassuring her that she did not believe the rumors. Naumovski claims that Scholl failed to take any significant action to stop the rumors.

Naumovski's performance evaluation for the 2008-2009 season noted no performance deficiencies. Naumovski's contract was renewed for the following year, and she received a salary increase.

*B. The 2009-2010 Season: Rumors Escalate*

In late September 2009, shortly after the start of the academic year, a student-athlete on the women's basketball team approached James Norris (then Binghamton's Senior Associate Athletic Director) and informed him that Naumovski was rumored to be engaged in an "inappropriate relationship" with J.W. Like Scholl, Norris states that he understood the rumors to refer to a relationship of favoritism between a coach and a student-athlete, rather than to a sexual relationship between the two. Norris recalls discussing the rumors with Joel Thirer, then Athletics Director, who assured him that the allegations were the baseless fabrications of disgruntled former members of the Binghamton Athletics community. On September 30, 2009, Norris replaced Thirer as Interim Athletics Director.

---

[2] Naumovski does not make clear whether the rumored sexual relationship was deemed "inappropriate" because the relationship was between members of the same sex or between a university official and a student in her charge.

5

In October 2009, the athletics department began to escalate its response to the Naumovski rumors. Scholl imposed various restrictions on interactions between coaches and student-athletes to avoid any perception of impropriety. As a result of the increased scrutiny triggered by these restrictions, Naumovski began to suffer from depression and stress-induced weight loss.

In early October, Naumovski met with Norris to address the rumors and reassure him that she was not engaged in an inappropriate relationship. According to Naumovski, Norris told her that "your problem is that you're a single female in your mid-30s."[3]

The rumors persisted through February 2010. Norris continued to receive complaints of Naumovski's alleged favoritism, while Scholl allegedly noticed Naumovski ignoring certain students. Scholl also explains that, during this time, she and Naumovski began to clash. Scholl felt that Naumovski was trying to undermine her leadership of the team. Naumovski does not deny tension between herself and Scholl; rather, she claims that any such tension ceased after a February 9, 2010 meeting with Scholl. Naumovski further claims that Scholl and Norris never expressed any additional concerns about her coaching performance after that time.

---

[3] App. 1374. Norris denies ever making this comment. He insists, rather, that Naumovski made the above statement about herself to explain why others assumed she was gay. As explained above, however, in deciding this appeal we must construe the evidence in the light most favorable to Naumovski. *See* note 1, *ante*. Therefore, we assume that Norris made the quoted statement.

*C. Naumovski Is Fired*

During a phone call on February 21, 2010, Scholl and Norris agreed to terminate Naumovski's employment. The decision was purportedly based on Naumovski's demonstrated favoritism toward certain student-athletes and the disruptive impact of her workplace conflicts with Scholl. Scholl and Norris agreed that they would inform Naumovski of their decision in March, after the athletic season concluded. During the intervening weeks, Norris continued to receive student complaints about Naumovski.

On February 23, J.W.'s family received an anonymous, vulgar letter accusing her of "screwing" Naumovski. J.W. informed Naumovski of the letter the following day. Around the same time, Naumovski learned from a different student that several student-athletes had been complaining about her to Norris.

On March 2, J.W.'s mother called Norris to request a meeting, and the two agreed to meet after the conclusion of the season. Their accounts differ about whether J.W.'s mother informed Norris of the letter during this initial phone call.

On March 8, Naumovski met with a union representative, Darryl Wood, who assured her that, before acting on the allegations, the university would conduct an investigation and notify her of the results by letter from "Human Resources." That proved wrong. On March 9, Norris contacted Naumovski to schedule a meeting for the following day. At that March 10 meeting, Norris informed Naumovski

that she was being fired "for performance reasons," but offered her the opportunity to resign "voluntarily."[4] Naumovski resigned.

*D. The Instant Action*

On October 4, 2010, Naumovski filed a discrimination charge with the New York State Division of Human Rights and the U.S. Equal Employment Opportunity Commission (the "EEOC"). On June 17, 2011, the EEOC issued Naumovski a Notice of Right to Sue letter. On September 15, 2011, Naumovski filed suit against Scholl, Norris, Binghamton, SUNY, and two anonymous individuals, alleging discrimination based on her sex, her perceived sexual orientation, and her national origin, in violation of Title VII, Title IX, the Equal Protection Clause and the First Amendment of the United States Constitution (as enforceable through 42 U.S.C. § 1983), the New York State Constitution, and the New York State Human Rights Law.

Following discovery, Defendants moved for summary judgment on all claims. The motion remained pending for several years. Finally, on April 17, 2018, the District Court granted the motion in part and denied it in part. Specifically, the District Court granted summary judgment to the institutional defendants (namely, Binghamton and SUNY) on all constitutional claims, but permitted several statutory claims to proceed to trial. With respect to Scholl and Norris, the District Court dismissed all claims except for Naumovski's sex-based disparate treatment and hostile work environment claims

_____

[4] App. 670, 1378

under § 1983.[5] Although Scholl and Norris expressly invoked qualified immunity in their motion for summary judgment, the District Court did not address this argument in its Memorandum-Decision and Order.

On May 9, 2018, Scholl and Norris moved for reconsideration of the District Court's partial denial of summary judgment. Again, Scholl and Norris specifically invoked qualified immunity. The District Court nevertheless denied the motion due to its untimeliness under the local rules and because it did not raise any new issues. On May 17, 2018, Norris and Scholl appealed the District Court's April 17, 2018 order based on their claimed entitlement to qualified immunity.

## 2. DISCUSSION

### A. Jurisdiction and Standard of Review

"Ordinarily, orders denying summary judgment do not qualify as 'final decisions' subject to appeal."[6] It is well-settled, however, that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within

---

[5] The District Court appears to have misnumbered Naumovski's surviving claims. Her § 1983 sex-based discrimination claim was her seventh (not eighth) cause of action, and her § 1983 hostile work environment claim was her eighth (not ninth) cause of action. *See* App. 20–21; Sp. App. 51.

[6] *Ortiz v. Jordan*, 562 U.S. 180, 188 (2011); *see also* 28 U.S.C. § 1291 (providing that the jurisdiction of a Court of Appeals extends only to "appeals from . . . final decisions of the district courts").

9

the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment."[7] Here, Norris and Scholl argue that the District Court erred as a matter of law in denying—or, more accurately, by failing to address—their claim to qualified immunity.[8] Jurisdiction is therefore proper.[9]

We review *de novo* a district court's denial of summary judgment based on a claim of qualified immunity.[10] When considering qualified immunity at the summary judgment stage, courts must "construe all evidence and draw all reasonable inferences in the non-moving party's favor."[11]

---

[7] *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *accord Winfield v. Trottier*, 710 F.3d 49, 52 (2d Cir. 2013).

[8] *See, e.g.*, Br. Appellants 10–12.

[9] Although our jurisdiction is predicated on an appeal of the District Court's denial of qualified immunity, we may also review the merits of the underlying claims. *See Demoret v. Zegarelli*, 451 F.3d 140, 152 (2d Cir. 2006) (stating that where we review a qualified immunity claim, we have pendent jurisdiction over the merits of the underlying constitutional claim). Our review is limited, of course, to the two § 1983 claims on appeal. We will review the District Court's rulings with respect to the other claims in this case, including the statutory claims against SUNY currently set for trial, if and when they are properly before us.

[10] *Mara v. Rilling*, 921 F.3d 48, 68 (2d Cir. 2019).

[11] *Bailey v. Pataki*, 708 F.3d 391, 399 (2d Cir. 2013).

*B. Qualified Immunity*

A government official is entitled to immunity from suit whenever (1) his conduct "did not violate clearly established law," or (2) "it was objectively reasonable for [the official] to believe that his action did not violate such law."[12] Government officials are thus shielded from liability whenever their actions are based on reasonable mistakes of law or fact.[13]

When analyzing whether the right violated was "clearly established," the Supreme Court has repeatedly (and recently) reminded us that clearly established law must be "particularized" to the facts of the case and must not be defined "at a high level of generality."[14] In other words, officials only forfeit their immunity when "existing precedent . . . [has] placed the statutory or

---

[12] *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007) (internal quotation marks omitted); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (requiring that the law be "clearly established at the time an action occurred"); *Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("[I]f officers of reasonable competence could disagree on this issue, immunity should be recognized.").

[13] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." (internal quotation marks omitted)); *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (requiring that "a reasonable official would understand that what he is doing violates that right").

[14] *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal quotation marks omitted); *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

constitutional question beyond debate"[15] and that precedent has been recognized "under similar circumstances."[16] Qualified immunity thus protects "all but the plainly incompetent" and those who "knowingly violate the law."[17]

When addressing a claim of qualified immunity, it is often appropriate (but not required) to first address the "threshold inquiry" of whether the plaintiff has alleged a violation of federally protected rights "at all."[18] If the plaintiff has demonstrated such a violation, we must still determine whether the application of that right to the circumstances at issue was "clearly established" at the time of the conduct,[19] and whether an "objectively reasonable" officer would

---

[15] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

[16] *White*, 137 S. Ct. at 552.

[17] *Id.* at 551 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)).

[18] *Kelsey v. Cty. of Schoharie*, 567 F.3d 54, 61 (2d Cir. 2009) (internal quotation marks omitted); *cf. Pearson*, 555 U.S. at 236 (explaining that while addressing the threshold inquiry first is often appropriate, it "should no longer be regarded as mandatory" and the sequence of qualified immunity analysis should be left to the "sound discretion" of each court "in light of the circumstances in the particular case at hand").

[19] *Ganek v. Leibowitz*, 874 F.3d 73, 80 (2d Cir. 2017) (explaining that qualified immunity "applies unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct" (internal quotation marks omitted)).

12

have known that his conduct amounted to such a violation.[20] If our resolution of any of these inquiries is negative, we must conclude that an official is shielded by qualified immunity and entitled to summary judgment.

*C. Claims of Sex Discrimination in Public Employment under § 1983 and the Fourteenth Amendment*

In order to analyze Defendants' claims of qualified immunity, we must first clarify the contours (or at least the "clearly established" contours) of the right at issue on this appeal.

The only claims before us are Naumovski's two remaining § 1983 claims against Norris and Scholl, both of which allege violations of the Fourteenth Amendment's Equal Protection Clause:[21] (1) disparate treatment on account of sex, and (2) subjection to a hostile work environment on account of sex.

---

[20] *Anderson*, 483 U.S. at 640 (requiring that "a reasonable official would understand that what he is doing violates that right"). In recent years, the Supreme Court has begun to syntactically combine these latter two questions into a single inquiry, *i.e.,* whether an official violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix*, 136 S. Ct. at 308 (internal quotation marks omitted). Regardless of how these inquiries are phrased, the substance remains the same.

[21] The Equal Protection Clause of the Fourteenth Amendment provides, in relevant part: "No State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV.

13

A plaintiff who claims sex discrimination in public employment in violation of the Fourteenth Amendment may bring suit pursuant to § 1983.[22] Such § 1983 discrimination claims parallel Title VII discrimination claims in many respects.[23] For instance, as with Title VII claims, a plaintiff may allege both traditional "disparate treatment" claims and "hostile work environment" claims. The basic elements of such claims, whether pursued under Title VII or § 1983, are similar: (1) a plaintiff claiming disparate treatment under either statute must plausibly allege that she suffered an "adverse employment action" taken "because of" her sex,[24] and (2) a plaintiff claiming a hostile environment must plausibly allege offensive conduct based on sex that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[25]

Despite these similarities, § 1983 and Title VII claims differ in important ways.[26] First, and most obviously, a plaintiff advancing a claim pursuant to § 1983 must plausibly allege that "the alleged

[22] *See Raspardo v. Carlone*, 770 F.3d 97, 113–14 (2d Cir. 2014) ("[S]tate and local officials can be held individually liable under 42 U.S.C. § 1983 for violating the Equal Protection Clause of the Fourteenth Amendment by discriminatory acts against those who work under them.").

[23] *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88 (2d Cir. 2015).

[24] *Id.* at 85. Adverse employment actions include terminations, demotions, or even the imposition of an "excessive workload." *Id.* at 85, 88.

[25] *Raspardo*, 770 F.3d at 114 (internal quotation marks omitted).

[26] *See, e.g.*, *Patterson v. Cty. of Oneida*, 375 F.3d 206, 225–26 (2d Cir. 2004) (enumerating several differences between Title VII and § 1983 claims).

deprivation was committed by a person acting under color of state law."[27] Title VII has no such requirement. Second, unlike a Title VII claim, which may be brought only against the employing entity, a § 1983 claim "can be brought against an[y] individual" responsible for the discrimination.[28] Third, while an employer may be liable under Title VII for any discriminatory conduct that can properly be attributed to the employer through agency principles,[29] § 1983 does not permit such vicarious liability. "If [an individual] defendant has not *personally* violated a plaintiff's constitutional rights, the plaintiff cannot succeed on a § 1983 action against the defendant."[30]

We emphasize now a fourth crucial distinction between Title VII and § 1983 claims: the required degree of causation.

As the Supreme Court recently clarified, the disparate treatment provision of Title VII is unusual in that it incorporates a

---

[27] *Vega*, 801 F.3d at 88 (internal quotation marks omitted).

[28] *Id.* (emphasis added); *see also Feingold v. New York*, 366 F.3d 138, 159 n.20 (2d Cir. 2004).

[29] *See Raspardo*, 770 F.3d at 114–15; *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 273–74 (2d Cir. 2016) ("Congress has directed federal courts to interpret Title VII based on agency principles.").

[30] *Raspardo*, 770 F.3d at 115 (emphasis in original); *see also Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015) ("Because vicarious liability is inapplicable to § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." (internal quotation marks and alterations omitted)).

"lessened causation standard."[31] Under Title VII, a plaintiff may succeed simply by establishing that sex (or another protected characteristic) was a "motivating factor for any employment practice, even though other factors also motivated the practice."[32] Thus, even if an employer can establish that legitimate, non-discriminatory reasons also provided sufficient reason for the adverse action, the employer may still be liable under Title VII. In other words, an employer's insistence that he would have terminated the plaintiff anyway is no defense.

This "lessened causation standard" is the product of deliberate and specific legislation. Indeed, prior to 1991, an employer "could escape liability if it could prove that it would have taken the same employment action in the absence of all discriminatory animus."[33] In the Civil Rights Act of 1991, however, Congress added a new provision to Title VII that reduced the causation standard under that law to require merely "motivating factor" for disparate treatment claims.[34] Title VII, therefore, now differs markedly from ordinary tort legislation with respect to causation.

---

[31] *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 349 (2013).

[32] *Nassar*, 570 U.S. at 349 (citing 42 U.S.C. § 2000e–2(m)).

[33] *Id.* at 348 (describing the consensus of six justices in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)).

[34] *Id.* at 348-49.

Not so § 1983. As the Supreme Court has explained, a "standard requirement of any tort claim" is that plaintiff show "that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct."[35] This standard, the Supreme Court has explained, is "the background against which Congress legislate[s]" and "the default rules it is presumed to have incorporated."[36] Indeed, "but-for" causation has long been a standard prerequisite in § 1983 claims generally.[37] Congress has passed no legislation reducing the causation standard for employment discrimination suits brought under § 1983.

It follows, therefore, that a plaintiff pursuing a claim for employment discrimination under § 1983 rather than Title VII must

---

[35] *Id.* at 346–47 (internal quotation marks omitted); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) ("To establish a disparate-treatment claim under the plain language of the ADEA . . . a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision.").

[36] *Nassar*, 570 U.S. at 347. We note as well that the Supreme Court recently granted a petition for a writ certiorari in *National Association of African American-Owned Media v. Comcast Corp.*, 743 F. App'x 106 (9th Cir. 2018), *cert. granted in part*, 2019 WL 1116317 (U.S. June 10, 2019) (No. 18-1171), on the following question: "Does a claim of race discrimination under 42 U.S.C. § 1981 fail in the absence of but-for causation?"

[37] *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 286–87 (1977) (rejecting a pure "motivating factor" test and requiring but-for causation in the context of a plaintiff's § 1983 claim based on the violation of his First Amendment rights); *see Warner v. Orange Cty. Dep't of Prob.*, 115 F.3d 1068, 1071 (2d Cir. 1996) (observing that "[t]he Supreme Court has made it crystal clear that principles of causation borrowed from tort law are relevant to civil rights actions brought under section 1983" (internal quotation marks omitted)).

establish that the defendant's discriminatory intent was a "but-for" cause of the adverse employment action or the hostile environment. It is insufficient to establish simply that invidious discrimination was "a motivating factor" of the offending conduct.[38] Accordingly, a court considering a § 1983 claim at summary judgment must determine whether, construing the evidence in a light most favorable to the plaintiff, a reasonable jury could find that the adverse employment action would not have occurred "but-for" sex discrimination.

This important distinction is implemented easily through the familiar framework set forth in *McDonnell Douglas Corp. v. Green*.[39]

---

[38] Several of our previous cases have elided this distinction between § 1983 and Title VII analyses. *See Vega*, 801 F.3d at 88; *Demoret*, 451 F.3d at 149 ("Once action under color of state law is established, the analysis for [§ 1983 claims] is similar to that used for employment discrimination claims brought under Title VII."); *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004) (applying the traditional Title VII burden-shifting framework to § 1983 claims). Prior to the Supreme Court's decisions in *Gross* and *Nassar*, the failure to recognize distinct causation standards for Title VII and § 1983 claims was perhaps defensible. In light of these supervening Supreme Court decisions, however, we may no longer gloss over the issue.

[39] 411 U.S. 792 (1973). *McDonnell Douglas* and its progeny created a three-step burden shifting framework for identifying discriminatory intent. At the first step, a plaintiff must establish a *prima facie* case of sex discrimination by demonstrating that "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016) (internal quotation marks omitted). At the second step, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the adverse employment action." *Id.* (internal quotation marks omitted). At the third step, the burden shifts back and "the plaintiff's admissible evidence must show circumstances that would

Indeed, courts already employ the *McDonnell Douglas* framework to analyze § 1983 claims.[40] When doing so, however, courts must account for a § 1983 plaintiff's higher burden of producing evidence from which a jury could infer that the individual's discriminatory intent was a *"but-for" cause* of the adverse employment action.

Accordingly, at the third step of the *McDonnell Douglas* analysis, a plaintiff asserting a § 1983 claim bears a higher burden in establishing that the employer's alternative, nondiscriminatory reason for the adverse employment action is "pretextual." To establish "pretext" under Title VII, a plaintiff need only establish "that discrimination played a role in an adverse employment decision."[41] In other words, a Title VII plaintiff need only prove that the employer's stated non-discriminatory reason was *not the exclusive* reason for the adverse employment action.[42] By contrast, to establish "pretext" under § 1983, a plaintiff must establish that the employer's stated reason would not, alone, constitute a *sufficient* basis for pursuing an adverse action. In other words, a § 1983 plaintiff must establish that the

be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Id.* (internal quotation marks omitted).

[40] *Raspardo*, 770 F.3d at 125 ("[A] § 1983 claim for sex discrimination is analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green* . . . utilized in Title VII claims.").

[41] *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 157 (2d Cir. 2010).

[42] *Vega*, 801 F.3d at 86 (recognizing that because Title VII "does authorize a 'mixed motive' discrimination claim," a plaintiff in a Title VII case "need not allege 'but-for' causation" (internal quotation marks omitted)).

employer's stated non-discriminatory reason is either false or inadequate to support the adverse employment action.

*D. Application*

We now apply these principles to Naumovski's two § 1983 sex discrimination claims against Norris and Scholl.

First, we note that, as employees of public universities acting in their official capacities, Norris and Scholl are indisputably subject to suit under § 1983 and are "government officials" for the purposes of qualified immunity.[43]

In this case, however, our review of the District Court's (implicit) rejection of Norris's and Scholl's claims of qualified immunity is complicated by several factors. *First*, the District Court never addressed the claims of qualified immunity in its Memorandum-Decision and Order; it is therefore impossible to review its specific reasoning in denying relief on this ground. *Second*, while both the complaint and the District Court's Memorandum-Decision and Order conclude that Defendants' alleged conduct constitutes sex discrimination (either through disparate treatment or subjection to a hostile environment), *neither* explains precisely how Defendants' conduct can be so construed. *Third*, the District Court opinion conflates

---

[43] *See, e.g.*, *Faghri v. Univ. of Conn.*, 621 F.3d 92, 98 (2d Cir. 2010) (concluding that officials of the University of Connecticut were entitled to qualified immunity in a § 1983 suit brought by a terminated university employee).

its analysis of Naumovski's Title VII and § 1983 claims, rendering our task of reviewing only the § 1983 claims more difficult.

In the absence of a clear District Court ruling, we are left to reconstruct the logic underlying its decision as best we can. After doing so, we conclude that no theory can sustain the District Court's implicit denial of Defendants' qualified immunity. We discuss each possible theory in turn.

*1. Disparate Treatment Claim*

 *a. Defendants Acted Pursuant to their Own Sex-Based Animus*

The simplest interpretation of Naumovski's § 1983 claim for "discrimination and disparate treatment" is that Defendants allegedly acted to terminate her employment because of animus toward women.[44] Here, the primary basis for inferring such animus appears to be Naumovski's sworn attestation that Norris told her "your problem is that you're a single female in your mid-30s."[45] Assuming that Norris made that statement, and that its content could be

---

[44] For the sake of conceptual clarity, we distinguish between two different forms of discriminatory intent: *animus* and *stereotyping*. By "animus," we mean "a bare desire to harm," *Romer v. Evans*, 517 U.S. 620, 634 (1996) (internal ellipses omitted); and by "stereotyping," we mean "the supposition that [an individual] *will* conform to a [class-based] stereotype" and is therefore less suited to perform a certain function, *Back*, 365 F.3d at 119 (emphasis in original). *See* note 50 and accompanying text, *post*.

[45] App. 1374.

21

understood to disparage a subset of women,[46] the statement is insufficient evidence from which a jury could infer Norris's discriminatory intent. As we have observed, "stray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination."[47] Norris's one-off comment is precisely the sort of "stray remark" that is insufficient to support an inference of discriminatory intent.

The District Court appears to acknowledge that Norris's alleged statement, by itself, is insufficient to defeat a motion for summary judgment. It therefore appeals to "other indicia of discrimination" to bolster the significance of this otherwise stray comment.[48] The only "other indicia," however, is evidence suggesting that Scholl and Norris interpreted the rumors as alleging a sexual relationship between Naumovski and J.W., rather than mere favoritism from one

---

[46] *Back*, 365 F.3d at 118 n.7 (recognizing claims where the defendants do not "discriminate against the class of men or women as a whole but rather treat[] differently a subclass of men or women" (internal quotation marks omitted; emphasis in original)).

[47] *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998). By contrast, we have explained that remarks are not "stray" where they are sufficiently repetitive and severe so as to prove sufficient evidence of discriminatory intent. Specifically, we have found this to be the case where the remarks "were (1) made repeatedly, (2) drew a direct link between gender stereotypes and the [adverse employment decision], and (3) were made by supervisors who played a substantial role in the decision to terminate." *Back*, 365 F.3d at 124 n.12. Here, only the last is evident.

[48] Sp. App. 37.

to the other.[49] The invocation of such evidence is unavailing. Even if we assume Scholl and Norris interpreted the allegations against Naumovski as sexual in nature, that fact provides no additional support for a conclusion that Scholl's and Norris's own actions were based on discriminatory animus toward women generally or any subcategory of female employees in particular.

Insofar as the District Court denied summary judgment based on the belief that a reasonable jury could find that Norris and Scholl acted with discriminatory animus on account of Naumovski's sex, the record does not support such a finding. Thus, a claim based on that theory should not have survived a motion for summary judgment.

### b. *Sex Stereotyping: Conscious Biased Judgments of Sexual Behavior*

Another interpretation of Naumovski's § 1983 claim is that Norris and Scholl engaged in invidious sex *stereotyping*.[50]

---

[49] *Id.* at 38 ("While defendants Coach Scholl and AD Norris contend they did not believe the allegations about plaintiff and J.W. to be sexually based, plaintiff's version of the facts suggests otherwise.").

[50] To be clear, the sex stereotyping we discuss here is only *conscious* stereotyping. As we have explained previously, to establish an Equal Protection violation, a plaintiff "must prove that she suffered purposeful or intentional discrimination on the basis of gender." *Back*, 365 F.3d at 118. A claim of discrimination based on unconscious bias is, by its nature, not "purposeful or intentional" and therefore inadequate to state a claim under § 1983 and the Fourteenth Amendment. *See* note 44, *ante.*

23

On this theory, Norris's "single female in your mid-30s" remark,[51] coupled with Norris's and Scholl's allegedly inappropriate reaction toward the rumors,[52] might raise an inference of sex stereotyping, especially in light of Naumovski's apparently satisfactory performance record. [53] In other words, Norris and Scholl stereotyped Naumovski based on her sex (possibly in combination with other characteristics) as more likely to have engaged in a romantic or sexual relationship with J.W.[54] Defendants then fired Naumovski (at least in part) because of their wrongful and discriminatory belief that she engaged in sexual impropriety with a student and, subsequently, attempted to conceal that stereotyping played any role in their termination decision.

As a general matter, we agree that a plaintiff may establish a claim of disparate treatment by demonstrating that an employer acted

---

[51] App. 1374.

[52] *Id.* at 1370 ("Defendant[s] Scholl and Norris not only failed to take corrective action but gave credence to the false allegations by directing to me [sic] and other staff to refrain from 'touching' players and to avoid 'closed door' meetings with players.").

[53] Sp. App. 39 ("[P]laintiff has offered evidence suggesting [that Appellants' insistence that Naumovski's work performance declined] was merely a pretext for her termination; she contends she was never disciplined . . . .").

[54] At oral argument, counsel for Naumovski characterized this stereotype as a "spinster," suggesting that Defendants viewed Naumovski as lonely and in need of companionship.

24

against her because of a conscious belief that, on account of her sex, she was more likely to have engaged in sexual misconduct.[55]

Here, however, Naumovski cannot succeed on such a theory. As noted above, the claims before us were brought under § 1983 and the Fourteenth Amendment, *not* Title VII. Naumovski must therefore establish not only that Defendants' sex stereotyping biases played *some* role in the decision to terminate her, but that this stereotyping was a "but-for" cause of that decision.[56] As we explained above, a § 1983 plaintiff's burden at the third stage of the *McDonnell Douglas* analysis is not simply to establish that discrimination played *some* role in her termination, but that it played a decisive role. In other words, Naumovski must establish that a reasonable jury could find that Defendants would not have terminated her based on their stated reasons alone.

To be sure, there may well be cases in which misconduct findings based on sex stereotyping meet the "but-for" discrimination standard. Here, however, we do not think that the evidence, even construed in the light most favorable to Naumovski, satisfies that standard.

---

[55] *See, e.g., Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016) (holding that, under Title IX, the claims of an accused male student plausibly alleging a "pro-female, anti-male bias" in university adjudicatory proceedings survives a motion to dismiss); *see also Doe v. Purdue Univ.*, 928 F.3d 652, 667–670 (7th Cir. 2019).

[56] *See* notes 31–42 and accompanying text, *ante*.

First, Norris's alleged "single female in your mid-30s" comment provides only scant support for the proposition that Norris believed that single, mid-30's women are more prone to engage in sexual misconduct with a female student-athlete than are their male counterparts. And as we have explained above, isolated remarks "do not constitute sufficient evidence to make out a case of employment discrimination."[57]

Second, Naumovski has not produced competent evidence establishing that Defendants' stated reason for her termination— "performance reasons"[58]—was false or inadequate. Indeed, Naumovski admits that Scholl informed her of "a concern by some players that they weren't being coached equally."[59] Similarly, Naumovski admits that at a February meeting, Scholl commented that Naumovski's emotional state was "affecting [her] work."[60]

Moreover, while Naumovski points to her satisfactory 2008-2009 performance evaluation as evidence of pretext, Defendants' account of Naumovski's subsequent performance issues between October 2009 and February 2010 remains substantially undisputed. For instance, Naumovski does not materially dispute that Scholl's

---

[57] *Danzer*, 151 F.3d at 56; *see* note 47, *ante*.

[58] App. 1378.

[59] *Id.* at 1376.

[60] *Id.* at 1377.

personality and coaching style clashed with her own.[61] On the contrary, Naumovski's statement that "my relationship with Defendant Scholl improved" after the February 9, 2010 meeting implies that the relationship was in need of improvement.[62] Naumovski has, therefore, failed to produce evidence that would permit a finding that Defendants' stated reasons for firing her were false or insufficient.

In sum, while the District Court concluded that the record sufficed "to permit a rational finder of fact to infer that defendants' decision to terminate her was more likely than not motivated *in part* by sex-based discrimination,"[63] it did *not* conclude that a rational finder of fact could infer that such discrimination was a *but-for* cause of her termination. We conclude that the record before us does *not* permit a reasonable jury to infer that sex-based stereotyping by Defendants was a "but-for" cause of Naumovski's firing.

The record therefore does not support a claim that Defendants' conduct violated Naumovski's constitutional rights. Accordingly, insofar as the District Court interpreted Naumovski as advancing a "sex stereotyping" theory of sex discrimination, it erred in denying Defendants' motion for summary judgment.

---

[61] *Id.* at 681–82, 1339.

[62] *Id.* at 1377.

[63] Sp. App.  39 (emphasis added).

27

### c. Discrimination on the Basis of Sexual Orientation

Naumovski's complaint does not explicitly allege sexual orientation discrimination in its enumeration of her § 1983 claims.[64] Nevertheless, the District Court appears to have so interpreted her claims. Indeed, the District Court concluded that "Plaintiff has established that she is a member of several protected classes including . . . being perceived as gay."[65]

We need not decide whether the District Court erred in so construing Naumovski's complaint. Even if Naumovski had stated a sexual orientation discrimination claim, Defendants would have qualified immunity from such a claim.[66]

To the extent the District Court relied on our recent *en banc* decision in *Zarda v. Altitude Express, Inc.* in recognizing Naumovski's arguable sexual orientation discrimination claims,[67] it erred for at least

---

[64] App. 20.

[65] Sp. App. 37.

[66] At oral argument, Naumovski appeared to abandon claims for sexual orientation discrimination. It was unclear, however, whether she simply forfeited her claims of sexual orientation discrimination under *Title VII* (*i.e.*, the type of claim found to be cognizable in *Zarda v. Altitude Express, Inc.*, 883 F.3d 100 (2d Cir. 2018) (en banc)), which the District Court had already dismissed, or whether she also sought to forfeit her claims of sexual orientation discrimination under the Equal Protection Clause. In light of this ambiguity, we address the Equal Protection theory as well.

[67] 883 F.3d 100, 107 (2d Cir. 2018) (en banc), *cert. granted*, 139 S. Ct. 1599 (Apr. 22, 2019) (No. 17-1623).

two reasons. First, *Zarda* specifically addressed the question of whether *Title VII* prohibits sexual orientation discrimination. It did not address whether the Constitution prohibits sexual orientation discrimination. Thus, *Zarda* is only "clearly established law" for statutory sexual orientation discrimination claims under Title VII. It does not, however, "clearly establish" constitutional (*i.e.* § 1983) sexual orientation discrimination claims.

Second, even if it were reasonable for the District Court to interpret *Zarda* as establishing a sexual orientation discrimination claim under the Constitution,[68] the conduct at issue in this case predated the issuance of the *Zarda* decision. Prior to *Zarda*, our Court had expressly declined to recognize sexual orientation discrimination claims under Title VII, much less the Constitution.[69] Thus, if anything, the "clearly established law" at the time Defendants terminated Naumovski's employment was that sexual orientation discrimination was *not* a subset of sex discrimination. Insofar as the District Court relied on *Zarda*, therefore, Defendants were surely entitled to qualified immunity.[70]

---

[68] *See id.* at 122 ("We now conclude that sexual orientation discrimination is rooted in gender stereotypes and is thus a subset of sex discrimination.").

[69] *See Simonton v. Runyon*, 232 F.3d 33, 35 (2d Cir. 2000) ("Title VII does not prohibit harassment or discrimination because of sexual orientation."), *overruled by Zarda*, 883 F.3d 132.

[70] *See Ganek*, 874 F.3d at 80.

29

Nor could the District Court rely on freestanding constitutional principles separate from *Zarda*. To date, neither this court nor the Supreme Court has recognized § 1983 claims for sexual orientation discrimination in public employment. Moreover, when the conduct in this case occurred, neither of the Supreme Court's landmark same-sex marriage cases—*United States v. Windsor*[71] and *Obergefell v. Hodges*[72]—had been decided. It was, therefore, not yet clear that all state distinctions based on sexual orientation were constitutionally suspect.[73]

Thus, even if it is possible today that sexual orientation discrimination in public employment may be actionable under § 1983, at the time of the challenged conduct here such a constitutional prohibition was not yet "clearly established."[74] Accordingly,

---

[71] 570 U.S. 744 (2013).

[72] 135 S. Ct. 2584 (2015).

[73] To be sure, the Supreme Court had already begun to scrutinize laws that reflected "animosity" toward gays. *See Romer v. Evans*, 517 U.S. 620, 634 (1996); *see also Lawrence v. Texas*, 539 U.S. 558, 582 (2003) (O'Connor, J., concurring) ("Moral disapproval of this group, like a bare desire to harm the group, is an interest that is insufficient to satisfy rational basis review under the Equal Protection Clause."). Here, however, Naumovski has alleged no such class-based animosity or desire to harm. Nor could Naumovski have challenged such discrimination on a "class of one" theory, simply on the basis that her termination was individually arbitrary. *See Engquist v. Or. Dep't of Agric.*, 553 U.S. 591 (2008) (rejecting "class-of-one" equal protection claims brought under the Fourteenth Amendment in the context of public employment).

[74] *White*, 137 S. Ct. at 552.

Defendants were entitled to qualified immunity on discrimination claims based on an arguable sexual orientation theory.

### d. Liability for Students' Discriminatory Intent

As we explained above, we do not think Naumovski has established that Defendants' own discriminatory animus was a "but-for" cause of her termination. Nonetheless, the District Court's Memorandum-Decision and Order may be read to suggest that Defendants are liable for terminating Naumovski pursuant to the discriminatory intent of the students circulating the rumors.[75]

Here again, however, the distinctions between Title VII and § 1983 are crucial.

A Title VII plaintiff can succeed on a discrimination claim against an employer "even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the [decision-making] process."[76] Even in Title VII retaliation cases (which

---

[75] *See* Sp. App. 38 ("Norris learned about the anonymous, vulgar letter describing a sexual relationship between Naumovski and student athlete J.W. immediately prior to firing her . . . . Such inferences are enough to satisfy Namovski's minimal burden on a prima facie case.").

[76] *Holcomb v. Iona Coll.*, 521 F.3d 130, 143 (2d Cir. 2008) (internal quotation marks omitted); *see also Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999) (recognizing that "the impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision in violation of Title VII").

require a higher standard of causation than disparate treatment cases[77]), we have held that if an employee "manipulates an employer into acting as a mere conduit for his retaliatory intent," the employee's intent can be imputed to the employer under a "negligence" (*i.e.,* a "knew or should have known") standard.[78] And under Title VII, we have adopted agency principles to impute the behavior of student-athletes to their coaches.[79]

Here, we assume *arguendo* that students' malicious false accusations of sexual misconduct by Naumovski may raise an inference of sex-based animus.[80] Accordingly, if the student athletes who circulated false rumors thereby manipulated Defendants "into

---

[77] *Nassar*, 570 U.S. at 352 ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action.").

[78] *Vasquez*, 835 F.3d at 272, 274-75 (internal quotation marks omitted). We refer to such a theory of liability as a "cat's paw" theory. Similar agency principles underly the court's Title VII "hostile work environment" jurisprudence: when supervisors "knew or should have known" about severe or pervasive co-worker harassment and fail to take remedial action, the co-workers' discriminatory treatment is imputed to the employer. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 758–59 (1998) (explaining that under ordinary principles of tort, an employer is liable when the tort is attributable to the employer's own negligence).

[79] *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013).

[80] *Cox v. Onondaga Cty. Sheriff's Dep't*, 760 F.3d 139, 149 (2d Cir. 2014) (observing that "false statements . . . intended to establish a claim of racial harassment . . . could be viewed by a reasonable observer as themselves racial harassment").

acting as a mere conduit"[81] for the students' sex discriminatory animus—*i.e.*, if Defendants' negligence led them to terminate Naumovski as a result of the student-athletes' discriminatory intent—Binghamton's liability under Title VII is at least arguable.

Here, however, the claims on appeal were brought under § 1983 and the Fourteenth Amendment rather than Title VII. Accordingly, Naumovski's claim fails for two reasons. First, even if we assume that those students who initiated false rumors relied on Naumovski's sex in circulating the rumors, Naumovski failed to adduce evidence showing that her sex qualified as a "but-for" cause, rather than simply a motivating factor, of Defendants' adverse employment action. As we have explained above, § 1983 claims require "but-for" causation. Second, while the Supreme Court instructs that traditional agency principles can determine liability under Title VII,[82] no comparable vicarious liability applies to claims brought under § 1983.[83]

---

[81] *Vasquez*, 835 F.3d at 272 (internal quotation marks omitted).

[82] *Ellerth*, 524 U.S. at 754 ("We turn to principles of agency law, for the term 'employer' is defined under Title VII to include 'agents.'" (quoting 42 U.S.C. § 2000e(b)).

[83] *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 707 (1978) (holding that § 1983 liability cannot be premised on "*respondeat superior* or any other principle of vicarious liability").

Thus any claims based on Defendants' negligent facilitation of students' sex discriminatory intent necessarily fails, and Defendants should not have been denied summary judgment on that theory.[84]

## 2. *Hostile Work Environment*

Finally, Naumovski's § 1983 "hostile work environment" claim fails for similar reasons. Here too, the District Court appears to have conflated the § 1983 and Title VII inquiries,[85] and thus mistakenly denied summary judgment to Defendants.

---

[84] While a government official cannot be held *vicariously* liable under § 1983, an official may still be *personally* liable for knowingly furthering the discriminatory intent of a third party. *See Knight v. Nassau Cty. Civil Serv. Comm'n*, 649 F.2d 157, 162 (2d Cir. 1981) (holding that assigning an employee to minority recruitment against his wishes based on the perceived racial preferences of prospective minority applicants constituted "a violation of equal protection, remediable under 42 U.S.C. [§] 1983"); *see also Pleener v. N.Y.C. Bd. of Educ.*, 311 F. App'x 479, 482 (2d Cir. 2009) (non-precedential summary order) ("We agree that federal law does not permit an employer to discriminate based on race to accommodate the actual or perceived invidious biases of its clientele.") (relying on *Knight*, 649 F.2d at 162).

[85] Sp. App. 40-41. In fact, the District Court merged its analysis of Title VII, § 1983, *and Title IX*. We need not discuss at length the differences among these three claims. We note simply that an educational institution is liable for money damages under Title IX when an official "with authority to take corrective action to end the discrimination" is given "actual notice" of the discrimination and responds with "deliberate indifference." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290–91 (1989). This standard lies somewhere between the standards applicable to § 1983 and Title VII; the former requires that each individual defendant act with discriminatory purpose, while the latter incorporates agency principles to determine when an employer is liable for its agents.

The District Court devoted just two sentences to justifying this conflation, citing *Raspardo v. Carlone*[86] and *Demoret v. Zegarelli*[87] for the proposition that the "standard for showing a hostile work environment under § 1983 and the Equal Protection Clause [is] essentially the same as under Title VII."[88]

Our precedents do not support such a sweeping statement. As explained above, § 1983 differs from Title VII in several respects, including the standard of causation and the availability of vicarious liability.[89] Our precedents, including *Raspardo* and *Demoret*, simply indicate that, for claims arising under both laws, the *level of severity* to demonstrate a hostile work environment is similar.[90] Our precedents do *not*, however, imply identity between the claims in all other respects.

In this case, the differences between viable hostile work environment claims under Title VII and under § 1983 are crucial. This

---

[86] 770 F.3d 97, 114 (2d Cir. 2014).

[87] 451 F.3d 140, 149 (2d Cir. 2006).

[88] Sp. App. 40–41.

[89] *See* notes 26–42 and accompanying text, *ante.*

[90] *See, e.g., Demoret*, 451 F.3d at 149 (holding that to establish a claim of hostile work environment, a plaintiff must produce evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

is because Naumovski has failed to produce evidence, required for a § 1983 claim, establishing: (1) that Defendants' *own* conduct (as opposed to that of the students) created a sufficiently hostile work environment; *and* (2) that Defendants' conduct was a "but-for" cause of the hostile work environment. Instead, Naumovski (and the District Court) relied on the (Title VII) principle that a negligent employer may be held liable for the conduct of a supervisee. Naumovski and the District Court then imputed the allegedly sex-discriminatory conduct of student-athletes to the Defendants.[91] Even if this might be permissible in the Title VII context, it is legal error with respect to § 1983 claims.

Because Naumovski has failed to produce evidence that could establish that *Defendants themselves* clearly violated her Fourteenth Amendment rights, Defendants were entitled to summary judgment on the basis of qualified immunity on the hostile work environment claim as well.

## III. CONCLUSION

To summarize, we hold as follows:

(1) Section 1983 claims for discrimination in public employment require plaintiffs to establish that the defendant's

---

[91] Sp. App. 41–43 (citing *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 763 (2d Cir. 1998)).

discriminatory intent was a "but-for" cause of the adverse employment action.

(2) Section 1983 claims for discrimination in public employment cannot be based on a *respondeat superior* or "cat's paw" theory to establish a defendant's liability.

(3) Defendants were entitled to qualified immunity because, even when interpreted in the light most favorable to Naumovski, the record cannot support the conclusion that they violated her "clearly established" constitutional rights

For the foregoing reasons, we **REVERSE** the District Court's April 17, 2018 order with respect to the § 1983 claims against Defendants, we **ENTER** judgment for Defendants, and we **REMAND** the cause for further proceedings consistent with this opinion.